UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DAVID WALKOWIAK, and,**
**JAMES C. WATKINS**

    **Plaintiffs,**

v.          Case No.:

**NATIONAL HOCKEY LEAGUE,**

    **Defendant.**

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, David Walkowiak, and James Watkins, collectively ("Plaintiffs"), files this Complaint against Defendant, the National Hockey League, and in support of their claims states as follows:

**JURISDICTION AND VENUE**

1. This is an action for damages for violations of 42 U.S.C. § 1981 ("Section 1981").

2. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 201 et seq.

3. Venue is proper in the Middle District of Florida, because all of the events giving rise to these claims occurred in Hillsborough County, Florida.

**PARTIES**

4. Plaintiff David Walkowiak (Plaintiff Walkowiak) is a resident of Hillsborough County, Florida.

5. Plaintiff James Watkins (Plaintiff Watkins) is a resident of Pinellas County, Florida.

6. Defendant is a foreign corporation that operates as a professional hockey league in in Hillsborough County, Florida.

## GENERAL ALLEGATIONS

7. Plaintiffs have satisfied all conditions precedent, or they have been waived.

8. Plaintiffs have hired the undersigned attorneys and agreed to pay them a fee.

9. Plaintiffs request a jury trial for all issues so triable.

10. Plaintiffs engaged in protected activity under Section 1981.

11. Plaintiffs' protected activity included opposition to blatant and ongoing racism in Defendant's workplace for African-American co-workers who are a member of a protected class of persons under Section 1981.

12. Plaintiffs are employees whose rights to contract for employment, and enjoy the benefits of employment, are protected under Section 1981.

13. Under Section 1981, Defendant is an employer prohibited from interfering with any employee's contractual right to enjoy the same benefits, privileges, terms, and conditions of employment that all other employees of Defendant otherwise enjoy, regardless of the employee's race and/or color.

14. At all times material hereto, Defendant acted with malice and reckless disregard for Plaintiffs' protected rights under Section 1981.

## FACTS

15. Plaintiff David Walkowiak was employed by Defendant as an Off Ice Official for Defendant at the Tampa Bay Lightning games in Tampa, Florida, from September 1, 2005 through February 27, 2020.

16. Plaintiff James C. Watkins was employed by Defendant as an Off Ice Official for Defendant at the Tampa Bay Lightning games in Tampa, Florida, from 1998 through February 27, 2020.

17. As part of their duties, Plaintiffs wore a headset that allowed the Off Ice Officials, Plaintiffs' supervisor, and other personnel of Defendants, to communicate with each other.

18. In approximately August 2013, Ron Brace (Brace) became the permanent supervisor of all Plaintiffs. At or near that time, Pat DeLorenzo, Jr. (Delorenzo) was promoted to Scoring Systems Manager and was also considered a supervisor to all Plaintiffs.

19. Ron Brace and DeLorenzo were also included in the communications system for the Off Ice Officials.

20. DeLorenzo also regularly made racially offensive comments about African-Americans, referring to African-Americans as "nigg**s."

21. DeLorenzo made negative racial comments about Defendant's employees, including but not limited, to Defendant's African-American hockey players and the African-American veteran, Sonya Bryson-Kirksey, who sings the National Anthem at Tampa Bay Lightning games at Amalie Arena where Plaintiffs worked.

22. Defendant NHL employs other African-Americans that work in the Amalie Arena where Plaintiffs worked in various capacities, including but not limited to, the video coach and the goaltending coach for the Tampa Bay Lightning.

23. On December 14, 2019, DeLorenzo, at work in the booth with other co-workers, told Plaintiff that "chocolate" was his code word for "nigg**s" when speaking about the NHL team with African-American players that were playing that night.

24. The Tampa Bay Lightning, a governing member of Defendant NHL, plays in the Amalie Arena where Plaintiffs worked and had at least three African-American hockey players at the time DeLorenzo made his racial comments in 2019. Though lack of diversity should not sanction racial discrimination, it was the Tampa Bay Lightning, playing in the same facility at which Plaintiffs worked, that forged a path of inclusivity and in 2021 made history by being the first to start a line of all African-American hockey players.

25. Plaintiffs, as well as their supervisor Brace, and other NHL employees, hockey players, coaches, entertainers, and crew working at the stadium during hockey games, were exposed to DeLorenzo's intentionally racist comments.

26. Plaintiffs opposed the racially discriminatory comments of DeLorenzo, and for several years, including during the months of November and December of 2019, reported their complaints to their supervisor, Brace, requesting that Defendant put a stop to DeLorenzo's racist comments and behavior at work.

27. Defendant and Brace did nothing to stop DeLorenzo's racism for several years.

28. The racial comments became so offensive and so pervasive that in November and December of 2019 Plaintiffs learned another co-worker, also an Off Ice Official, began recording by video and audio DeLorenzo's racial comments at work, including at the Amalie Arena where the Tampa Bay Lightning play, during hockey games during the month of December 2019.

29. In December 2019, Brace attempted to terminate Plaintiff Watkins.

30. Defendant, through Brace, attempted to terminate Plaintiff Watkins because of his complaints about DeLorenzo's racism at work.

31. Patrice Distler, (Distler), Defendant's Vice President of Human Resources, and Kate Watson (NHL Attorney Watson), Defendant's Senior Counsel, called Plaintiff Watkins and

informed him that Brace had made complaints about him. However, Plaintiff Watkins responded that Brace's complaints were due to Watkins' complaints of DeLorenzo's racist behavior and Brace's inaction.

32.     In December of 2019, Plaintiff Watkins disclosed all of DeLorenzo's racially offensive comments, along with other offensive comments, to Distler and NHL Attorney Watson and informed them that there was video evidence of DeLorenzo's racist statements in front of NHL employees and Brace. Defendant later learned that Plaintiff Walkowiak was also a witness to DeLorenzo's racist conduct and Brace's inaction.

33.     Distler and NHL Attorney Watson contacted Plaintiff Walkowiak after speaking with Plaintiff Watkins in regards to the complaints about DeLorenzo's racism and Brace's failure to take action.

34.     In December of 2019, Plaintiffs Walkowiak and Watkins told Distler and NHL Attorney Watson that they were concerned about being terminated by Defendant in retaliation for reporting DeLorenzo's racist and offensive conduct, particularly because Brace protected DeLorenzo (despite Plaintiffs' complaints to Brace about DeLorenzo's racist and offensive conduct).

35.     Plaintiffs knew, for example, that a recent previous female Off Ice Official from another city was terminated by Defendant shortly after reporting sexual harassment at work.  Thus, Plaintiffs were extremely reluctant to engage in further additional protected activity, especially because their prior complaints about DeLorenzo to Brace had been ignored entirely for so long.

36.     In fact, Brace had previously told Plaintiffs, and others, that if the NHL received complaints, Defendant would find a way to terminate them.

37. This policy was reinforced by David Baker, ("Baker"), Sr. Director, Off-Ice Officials, based in the NHL Toronto Headquarters, when he reiterated the example given by Brace.

38. Brace had also boasted that due to his (Brace's) close relationship with Distler, she would fire anyone he (Brace) wanted.

39. Despite all of this, Distler and NHL Attorney Watson told Plaintiffs that they would be protected under the Defendant's whistle-blower policy and would not be retaliated against for engaging in a protected activity due to Defendant's allegedly strong anti-retaliation policy if they reported the specifics of DeLorenzo's racist and offensive conduct and provided the video recordings of DeLorenzo's racist and offensive conduct at work.

40. NHL Attorney Watson and Distler received six video recordings of DeLorenzo's racially discriminatory behavior, all of which occurred during the month of November and December 2019, including referencing an NHL team as the "chocolate" team, his use of the word "nigg**r", stating, "once you go black, you never go back," along with videos of DeLorenzo making other comments such as asking someone if they wanted "head," and that others were "internally retarded" during hockey games at Amalie Arena.

41. Despite Distler and NHL Attorney Watson's assurances, Plaintiffs were not protected by Defendant's supposed anti-retaliation policy and instead were the target of a proactive, vengeful, campaign by Defendant to terminate them for reporting the offensive and discriminatory behavior of DeLorenzo.

42. For example, Baker instructed the interim supervisor of Plaintiff to forward any email or text message from Plaintiffs directly to Baker.

43. NHL Attorney Watson instructed that the video recordings be destroyed.

44. On or about January 2, 2020, Defendant finally terminated DeLorenzo and Brace.

45. Neither Plaintiff was considered for any position held by DeLorenzo or Brace. In fact, Plaintiffs work efforts involved training new NHL employees who would eventually replace DeLorenzo and Brace.

46. Presumably coming up empty with Baker's instructions to compile all of Plaintiffs' emails and text messages to his interim supervisor, Defendant apparently went back to DeLorenzo to find any comment of Plaintiffs' that could be painted as discrimination by Defendant and used as a means to carry out its unveiled threats of retaliation for reporting discriminatory behavior.

47. Almost two months after terminating DeLorenzo and Brace, on or about February 27, 2020, less than two months after they engaged in protected activity, Defendant terminated Plaintiffs Walkowiak and Watkins for pretextual reasons.

48. Specifically, Defendant terminated Plaintiffs for alleged involvement in a group message thread of DeLorenzo's an unknown number of years earlier.

49. Despite a request from Walkowiak to provide a copy of the alleged text message, Defendant refused to provide any copy of the alleged text message.

50. When Walkowiak asked if the text message had been authenticated, Watson stated that "We believe the text message to be authentic." However, Watson refused to answer the question inferring that the alleged text message had not been authenticated.

51. Defendant did not investigate the text messages of any other Off Ice Officials, other than the Plaintiffs and those who provided the concrete evidence that corroborated DeLorenzo and Brace's discriminatory conduct.

52. Despite Plaintiffs' opposition and multiple instances of protected activity, Defendant did nothing to stop the racially discriminatory comments that were broadcast to its

employees and crew every night on its communication system and in the booth shared by the Off Ice Officials.

53. Instead, only after being confronted with video evidence of the wrongful behavior, Defendant terminated DeLorenzo and Brace, and then terminated the whistleblowers, including Plaintiffs Walkowiak and Watkins.

54. Defendant then promoted Gary Reilly, another NHL official that heard – and stayed silent – for all of DeLorenzo's racial slurs. Thus, Defendant punishes those that complain and rewards those that remain silent.

55. Plaintiffs were terminated due to their opposition to and engagement in protected activity related to DeLorenzo's racist and offensive behavior, as well as reporting the racist and offensive behavior on multiple occasions and participating in the investigation of those complaints.

## COUNT I — 42 U.S.C. § 1981 RETALIATION

56. Plaintiffs reallege and readopt the allegations of Paragraphs 1-54 of this Complaint, as though fully set forth herein.

57. Plaintiffs reported racial discrimination of members of a protected class of persons under Section 1981.

58. By complaining about the offensive racial remarks and participating in the investigation of those remarks, Plaintiffs engaged in protected activity under Section 1981.

59. Defendant retaliated against Plaintiff for engaging in protected activity under Section 1981 by terminating Plaintiffs' employment.

60. Defendant's actions were willful and done with malice.

61. Defendant's retaliation was based solely on Plaintiffs' exercise of their right to resist and oppose unlawful discrimination and harassment, which is protected under Section 1981.

62. As a direct and proximate result of Defendant's willful and reckless discrimination against Plaintiffs, Plaintiffs have suffered and will continue to experience pain and suffering, mental anguish, emotional distress, and loss of earnings and other employment benefits and job opportunities.

63. Plaintiffs were injured due to Defendant's violations of Section 1981, for which Plaintiffs are entitled to legal and injunctive relief.

**WHEREFORE**, Plaintiff demands:

(a) A jury trial on all issues so triable;

(b) That process issue and that this Court take jurisdiction over the case;

(c) Judgment against Defendant, permanently enjoining Defendant from future violations of Section 1981, and remedying all lost income, raises, promotions, and other benefits of which Plaintiff was unlawfully deprived;

(d) Compensatory damages, including emotional distress, allowable at law;

(e) Punitive damages;

(f) Reinstatement of Plaintiffs to a position comparable to their prior position, or in the alternative, front pay;

(g) Prejudgment interest on all monetary recovery obtained;

(h) All costs and attorney's fees incurred in prosecuting these claims; and

(i) For such further relief as this Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury as to all issues so triable.

Dated this 10th day of January, 2022.

          Respectfully submitted,

          */s/ Brandon J. Hill*
          **BRANDON J. HILL**
          Florida Bar Number: 0037061
          Direct Dial: 813-337-7992
          **AMANDA E. HEYSTEK**
          Florida Bar Number: 0285020
          Direct Dial: 813-379-2560
          **WENZEL FENTON CABASSA, P.A.**
          1110 N. Florida Avenue, Suite 300
          Tampa, Florida 33602
          Main Number: 813-224-0431
          Facsimile: 813-229-8712
          Email: bhill@wfclaw.com
          Email: aheystek@wfclaw.com
          Email: aketelsen@wfclaw.com
          **Attorneys for Plaintiffs**